UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                  :
LUIS ANGELO OSORIO-SILVA, et al., :
                                  :
                  Plaintiffs,     :
                                  :
     -against-                    :    REPORT AND RECOMMENDATION
                                  :    04 Civ. 0252 (CM)(MDF)
QUINTESSENCE ALPACAS,             :
INTERNATIONAL, et al.,            :
                                  :
                  Defendants.     :
                                  :
----------------------------------X

TO:   THE HONORABLE COLLEEN McMAHON, U.S.D.J.

## Background

In January 2004, Luis Angelo Osorio-Silva, Marcos Lopez-
Cerrata, William Aguilar, and Santos Victor Lopez-Cerrata (the
"Plaintiffs"), migrant agricultural workers, filed a complaint
against their employers, Quintessence Alpacas, International
("QAI"), a New York entity "engage[d] in the production and
raising of livestock and/or fur-bearing animals," and Maria
Herlinda Bravo, alleging violations of the Fair Labor Standards
Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, the Migrant and Seasonal
Agricultural Worker Protection Act ("MSAWPA"), 29 U.S.C. §§ 1801,
*et seq.*, the New York Labor Law, and New York's common law of
contracts.  Compl. at ¶¶ 2,21.  The Plaintiffs characterized QAI
as a New York partnership operating under the laws of the state
of New York.  *See id*. at ¶ 16.  In March 2004, attorney Robert
Isseks ("Isseks") filed an answer on behalf of QAI and Bravo.

1

In February 2005, the Plaintiffs filed an amended complaint, which named four additional defendants: Centro de Majoramiento Genetico y de Reproduccion Avanzada de Camelidos, Limitada ("Centro"); Quintessence Alpacas, International Chile ("QAI Chile"); Quintessence and Co., Inc. ("Quintessence and Co."); and Mariana De La Garza. *See* Amended Compl. QAI and Bravo were given until February 22, 2005 to file an answer to the amended complaint. *See* Dkt. Sht. at entry dated 2/01/05.

Settlement Negotiations and Defendants' Default

On March 15, 2005, counsel for the Plaintiffs, Isseks, and Bravo appeared before me for a status conference. *See* Trans. of 3/15/05 Status Conf. At the conference, the parties indicated that they had engaged in settlement discussions and that QAI and Bravo had agreed to pay the amount requested by the Plaintiffs to settle the matter – $226,555. *See id*. at 2-3. Isseks explained, however, that he had just received a proposed stipulation of settlement requiring his clients to admit each allegation set forth in the complaint and that he had not yet conferred with his clients about the implications of making such admissions. *See id*. at 3-4. Plaintiffs' counsel then informed the Court that the reason the Plaintiffs proposed that the defendants admit the allegations of the complaint was because, without such admissions, the judgment would be considered an unsecured claim

in the defendants' pending bankruptcy proceeding.[1]  *See id*. at 5.
I informed the parties that, until the parties submitted a
written stipulation of settlement, discovery would proceed.  *See
id*. at 5.

On April 1, 2005, counsel for the Plaintiffs and QAI and
Bravo appeared before me for a status conference.  *See* Trans. of
4/01/05 Status Conf.  Isseks informed the Court that QAI and
Bravo were, indeed, in default and that Plaintiffs' counsel had
made an application to the clerk of the Court for an entry of
default.  *See id*. at 3-4.  However, there is no entry on the
docket sheet that such an application was made or that the clerk
entered a default.

On May 4, 2005, before QAI and Bravo filed an answer to the
amended complaint, Isseks, with the consent of Bravo, withdrew
from representation of QAI and Bravo.  *See* Trans. of 5/4/05
Status Conf.  At the May 4, 2005 conference, Bravo explained to
the Court that QAI is a family farm in New York that she solely
owns.  *See id*. at 4.  She further stated that Centro and QAI
Chile are one corporate entity of which she owns 45 percent and

---

[1] In September 2004, after answering the complaint, QAI and
Bravo filed a petition in the Bankruptcy Court for the Southern
District of New York for relief under Chapter 13 of the United
States Bankruptcy Code.  *See* "Defendants' Memorandum of Law
Responsive to Judge McMahon's Directive that Magistrate Judge
Mark D. Fox Report and Recommend Regarding Issues of Default and
Damages" ("Defendants' Memo of Law"), Ex. B (Affidavit of Maria
Herlinda Bravo) at ¶ 7.  The Plaintiffs ultimately obtained
relief from the automatic stay.  *See id*. at ¶ 8.

that Centro does business as QAI Chile. *See id*. at 5. She

indicated that her family farm, QAI, is a separate and distinct

entity. *See id*. at 6. The Court advised Bravo that, if she was

the sole owner of QAI, she could represent QAI herself, but that,

as a non-lawyer, she could not represent a corporation *See id*.

<u>Motion for Default Judgment</u>

On June 9, 2005, the Plaintiffs filed a motion for default

judgment as to all of the defendants.[2] *See* Declaration of Daniel

Werner in Support of Plaintiffs' Motion for Default Judgment

("Werner Decl."). In his declaration in support of the motion,

the Plaintiffs' lawyer explained that, in March 2005, he and

Isseks engaged in settlement discussions and that "Mr. Isseks

agreed that Defendants would consent to a judgment in the amount

of $226,555.25, which would include $40,000 in attorney's fees

for Plaintiffs' counsel." *Id*. at ¶ 26. Plaintiffs' counsel

attached to his declaration copies of electronic mail messages

that he had exchanged with Isseks, which indicate that drafts of

a settlement agreement were sent back and forth between the two

lawyers. *See id*. at Ex. H. Plaintiffs' counsel also attached a

letter he received from Isseks, dated March 21, 2005, which

---

[2] While the Plaintiffs initially moved for default judgment
as to all of the defendants, at the most recent status conference
on November 15, 2005, the Plaintiffs' withdrew their motion as to
the four defendants added in the amended complaint - Mariana De
La Garza, QAI Chile, Centro, and Quintessence and Co. *See* Trans.
of 11/15/05 Status Conf. at 6-7. Accordingly, this Report and
Recommendation addresses only the defendants Bravo and QAI.

stated:

> Alex Smith and I have reviewed your proposed
> settlement papers and find them to be acceptable
> **except** for that part of the proposed default judgment
> which recites that the defendants are 'deemed to have
> admitted' the allegations contained in the First
> Amended Complaint. In our view, this raises
> essentially the same problem that I expressed to you
> and Judge Fox. Whether this language is in the body
> of the agreement or in the judgment that the parties
> agree to, the result would be the same: the defendants
> would be stipulating that the allegations in the
> complaint are deemed by them to be true, and this
> simply is not so. Instead, the defendants have made
> a cost-benefit decision not to defend the action.
>
> By this letter, defendants are consenting to a default
> judgment; the amount of the judgment is the full
> amount to which you claim the plaintiffs are entitled,
> $226,555.25, to be allocated as follows:
>
> > Luis Osorio-Silva: $47,124.00
> >
> > Marcos Lopez-Cerrata: $16,672.00
> >
> > William Aguilar: $42,944.15
> >
> > Victor Lopez-Cerrata: 79,615.10
> >
> > Attorney fees and costs allocated to Farmworkers
> > Legal Services of New York, Inc. and the Workers
> > Rights Law Center of New York, Inc.:
> > $40,000.00.
>
> With this consent there is no need for either a motion
> for default judgment or an assessment of damages.

*Id*. at Ex. I (emphasis added). The Plaintiffs argued that "[i]t

is clear from defense counsel's March 21, 2005 letter to

Plaintiffs' counsel that Defendants fully intended to stipulate

to the entry of a default judgment in the amount Plaintiffs had

requested" and that the letter "appears to obviate the need for

an inquest, as permitted by Fed. R. Civ. P. 55(b)(2), by indicating that there is no need for an assessment of damages." Memorandum of Law In Support of Plaintiffs' Motion for Default Judgment (Memo of Law).

On June 30, 2005, Bravo filed a notice of appearance on behalf of herself, QAI, and Centro. *See* Notice of Appearance. On the same day, she also filed papers in opposition to the Plaintiffs' motion and a motion to dismiss the Plaintiffs' amended complaint for lack of jurisdiction. *See* Affirmation to Oppose Motion Seeking Default Judgment ("Bravo Affirmation") and Motion to Dismiss. In her affirmation in opposition, Bravo asserted that Centro is a foreign corporation and does not conduct business in the United States. *See* Bravo Affirmation at 4. She also asserted that she and the entities under which she does business are exempt from the requirements of the FLSA and the MSAWPA. *See id*. at 6. In support of this assertion, Bravo attached an opinion letter from the United States Department of Labor addressed to Mariana De La Garza, which concluded that, based on the information provided by De La Garza, while some employees may qualify for individual coverage under the FLSA, any employee who is engaged in agriculture would meet the criteria of the FLSA Section 13(b)(12) exemption from overtime pay requirements. *See id*. at Ex. F. The letter further advised that, "if, as stated in your letter, over the past four years

your farm has employed at most five employees in any calendar quarter, the farm would meet the criteria of the 13(a)(6) 500 'man-day' exemption from both minimum wage and overtime pay requirements." *Id.* With respect to the MSAWPA, the letter stated,

> From what is stated in your letter, it appears that your employees are permanent year-round employees, not migrant or seasonal workers, so the [MSAWPA] would not apply to your workers. However, if you were employing migrant and/or seasonal workers, Section 4(2) of the [MSAWPA] exempts small businesses (as measured by same the [sic] 500 "man-day" test as in the FLSA) from its provisions. The information in your letter suggests that your alpaca farm would qualify for this exemption, so you would not be responsible for compliance with the [MSAWPA].
>
> If, at some time in the future, your business exceeded the 500 "man-day" test, you may still meet the criteria for the Section 4(1) family business exemption. This section generally provides an exemption as long as any recruiting, soliciting, furnishing, employing, transporting, or hiring of any migrant or seasonal agricultural worker is performed only by the owner of a farm or immediate family member of the owner.

*Id.* Bravo, however, did not submit a copy of De La Garza's letter to the Department of Labor or provide the information on which the opinion letter was based. Bravo further claims that "[her] farm has always been a family farm, it was never incorporated" and is not a partnership. *Id.* at 7. She also affirms that she has paid the Plaintiffs in full and that they earned over the minimum wage. *See id.* at 9.

On July 14, 2005, your Honor entered an order denying the

7

individual defendants' motions to dismiss and striking the
motions to dismiss of Centro and QAI because they were filed by
Bravo, a non-attorney.  *See* Order of Reference and Denial of
Various Defense Motions.  From the order, it appears that your
Honor found, based upon the contradictory statements of the
parties and the confused state of the record at that time, that
QAI was a New York Corporation and could not be represented by
Bravo, who is not a lawyer.  Additionally, your Honor referred to
the undersigned the questions of against whom, if anyone, a
default judgment should enter and whether the purported
settlement should be enforced against any party.  *See id*.

     Plaintiffs's counsel and the individual defendants appeared
before me on August 4, 2005 for a status conference.  *See* Trans.
of 8/04/05 Status Conf.  First, the parties attempted to clarify
for the Court the confusion over whether the defendant entities
are corporations, partnerships, or sole proprietorships.  *See id*.
at 5-10.  Plaintiffs' counsel indicated that, while it was his
clients' position that QAI was a New York partnership, Bravo's
position was that QAI was "just a d/b/a for Maria Bravo."  *Id*. at
6.  The parties also explained that QAI Chile is a d/b/a for
Centro, which is a Chilean corporation, and Quintessence and Co.
is a New York corporation.  *See id*. at 6-10. In any event the
parties agreed for the first time on August 4, 2005, that QAI was
not a corporation.

Attorney Robert J. Hilpert subsequently filed a notice of appearance on behalf of all of the defendants, *see* Notice of Appearance, and, on October 28, 2005, filed an answer to the amended complaint, *see* Answer.  Additionally, the defendants filed a "Defendants' Memorandum of Law Responsive to Judge McMahon's Directive that Magistrate Judge Mark D. Fox Report and Recommend Regarding Issues of Default and Damages" ("Defendants' Memo of Law").

In their memorandum of law, the defendants argue that the Plaintiffs' motion for default judgment should be denied.  *See id*. at 8-15.  First, with respect to Bravo and QAI, the defendants assert that their failure to answer the amended complaint was not willful and their intent to litigate or settle the matter is evidenced by the fact that they answered the original complaint, engaged in discovery, consented to the filing of an amended complaint, and negotiated toward a settlement.  *See is*. at 10.  They further argue that Bravo's efforts in filing a *pro se* motion to dismiss on behalf of herself and the other defendants, including QAI, after her lawyer withdrew from representation and settlement negotiations broke down, while misguided and procedurally improper, fall "far short of willful disregard."  *Id*. at 11.

Second, the defendants argue that the Plaintiffs have not been prejudiced by the defendants' failure to answer the amended

complaint as delay, standing alone, does not constitute prejudice. *See id.* at 12.

Third, Bravo and QAI claim to have a meritorious defense to the claims in the amended complaint. *See id.* at 12-13. They argue that: (1) Centro and QAI are distinct entities and, therefore, the operations in Chile and the United States should not be "lumped together" to calculate qualifying hours under the FLSA; (2) the Plaintiffs are not workers intended to be covered by the MSAWPA; (3) Bravo, individually, or as her d/b/a QAI, has not violated the FLSA or MSAWPA. *See id.* In support of their defenses, the defendants submitted an affidavit of Bravo, in which she affirmed, *inter alia*, that Centro does business only in Chile, not the United States. *See id.* at Ex. B.

The Plaintiffs subsequently filed a supplemental memorandum of law in support of their motion for default judgment, in which they make several arguments refuting the defenses asserted by the defendants. *See* Supplemental Memorandum of Law in Support of Plaintiffs' Motion for Default Judgment ("Supp. Memo of Law"). They also submit evidence in support of their claims, including portions of the depositions of Bravo and De La Garza and the defendants' answers to the Plaintiffs' first set of interrogatories. *See* Declaration of Daniel Werner in Support of Plaintiffs' Supplemental Memorandum of Law in Support of Plaintiffs' Motion for Default Judgment at Exs. D, E, and G.

The Plaintiffs also submitted a reply to the Defendants'
Memo of Law, arguing that QAI and Bravo willfully defaulted in
the action as a cost-saving measure and should be bound by their
former attorney's stipulation to the entry of a default judgment
in his March 21, 2005 letter to Plaintiffs' counsel and in open
court on April 1, 2005. *See* Plaintiffs' Reply to Defendants'
Memorandum of Law Responsive to Judge McMahon's Directive that
Magistrate Mark D. Fox Report and Recommend Regarding Issues of
Default and Damage ("Plaintiffs' Reply") at 5-7. They further
argue that QAI and Bravo have not set forth a meritorious defense
because they merely assert that they are exempt from the
requirements of the MSAWPA and the FLSA without providing any
facts to support their position. *See id.* at 7-8. The Plaintiffs
contend that conclusory denials of liability are not sufficient
to show a meritorious defense. *See id.* Finally, the Plaintiffs
argue that, in the absence of a default judgment, they will be
prejudiced by the delay caused by Bravo and QAI and their failure
to comply with discovery demands. *See id.* at 8-9. Citing to the
declaration of Hartwig Kraft-von Wedel, an alpaca breeder
familiar with Bravo's business, which the Plaintiffs' submitted
in support of their motion for default judgment, the Plaintiffs'
assert that Bravo and QAI "are adept at moving their significant
assets around the globe to hide from their creditors." *Id.* at 8.
The Plaintiffs note that the information that Bravo and QAI have

failed to produce in discovery pertains to their foreign business dealings, which are the primary subject of the Plaintiffs' claims of fraud in the pending bankruptcy proceeding. *See id*. at 9. They assert, "The more time that has passed without Defendants responding to these requests, the more challenging this discovery becomes as Defendants continue to cover their tracks." *Id*. Finally, the Plaintiffs argue that the amount of the default judgment should be $226,555.25, the amount that QAI and Bravo initially agreed to pay in settlement of the Plaintiffs' claims. *See id*. at 9-10.

In their reply, the defendants argue that the motion for the entry of a default judgment should be denied because Bravo's default was not willful; rather, when her former attorney withdrew, she was confused as to how to proceed as a *pro se* litigant. *See* Defendants' Reply Memorandum of Law Responsive to Judge McMahon's Directive that Magistrate Judge Mark D. Fox Report and Recommend Regarding Issues of Default and Damages ("Defendants' Reply Memo of Law") at 4. The defendants further argue that, to the extent the Plaintiffs' seek "some *quasi* grant of summary judgment – based on their unilateral presentation of evidence without a hint of procedural propriety," relief through the default judgment in the amount demanded should be denied. *See id*. at 4-5. Further, they assert that, because the settlement agreement was never fully executed, it cannot serve as

the basis for an award of damages. *See id*. at 5. Finally, the defendants ask that this Court not consider, at this juncture, the assertions set forth in the Plaintiffs' supplemental memorandum of law in support of their motion for default judgment, in which the defendants argue the merits of their claims. *See id*. at 5-13. They argue that such arguments by the Plaintiffs are premature, as discovery has not been completed, let alone commenced as to the four additional defendants.

<u>Discussion</u>

Rule 55 of the Federal Rules of Civil Procedure sets forth a two-step process for obtaining a default judgment. First, when a defendant has failed to plead or otherwise defend, a plaintiff may notify the Clerk of the Court. *See* Fed. R. Civ. P. 55(a). This empowers the Clerk to enter a default against the party that has failed to appear. *See id*. Next, the plaintiff must seek the entry of a default judgment under Rule 55(b). Where the plaintiff's claim is for a sum certain and the defendant has failed to appear and is not an infant or an incompetent person, Rule 55(b)(1) allows the Clerk of the Court to enter judgment. *See* Fed. R. Civ. P. 55(b). "In all other cases," Rule 55(b)(2) governs and the party seeking a default judgment must make an application to the Court. Fed. R. Civ. P. 55(b)(2). Pursuant to Local Rule 55.2, a plaintiff must attach to the application for default judgment: (1) a copy of the claim to which no response

has been made; (2) the Clerk's certificate of default; and (3) a proposed form of default judgment. *See* Local Rules for the United States District Courts for the Southern and Eastern Districts of New York, Local Civil Rule 55.2(b).

Here, the Plaintiffs have not satisfied the procedural requirements because they failed to obtain an entry of default from the clerk of the Court. "Under the federal rules, '[e]ntry of a default is a prerequisite to entry of a default judgment.'" *Hirsch v. Innovation Int'l, Inc.*, No. 91 Civ. 4130, 1992 WL 316143, at *1 (S.D.N.Y. Oct. 19, 1992)). The failure to obtain an entry of default by the clerk, however, is not fatal to a motion for default judgment as "[r]igid adherence to these rules . . . must be balanced against the need for efficient administration of justice." *Id.* Courts have excused the failure to obtain an entry of default and have, instead, ordered the entry of default with a decision on the merits of the application for default judgment. *See id.* In this case, due to the confusion surrounding the settlement negotiations and Bravo's and QAI's initial stipulation to the entry of a default judgment, the Plaintiffs' failure to obtain an entry of default from the clerk should be excused and their motion for a default judgment should be construed as a request for entry of default as well as for entry of default judgment.

The decision whether to enter a default judgment is within

the sound discretion of the district court. *See Shah v. New York State Dept. of Civil Service*, 168 F.3d 610, 615 (2d Cir. 1999). When a defendant opposes a motion for default judgment or seeks to set aside a default judgment under Fed. R. Civ. P. 55(c), the district court should consider the following factors: (1) whether, and to what extent, the default was willful; (2) whether the defendants have a meritorious defense; and (3) whether vacating a default judgment or denying the plaintiff's application for default judgment would cause prejudice to the plaintiff. *See Credit Lyonnais Securities (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999); *SEC v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998). In deciding whether to enter a default judgment, "all doubts must be resolved in favor of the party [opposing the motion for default judgment] in order to ensure that to the extent possible, disputes are resolved on their merits." *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005).

Willfulness

In the context of default, willfulness has been interpreted "to refer to conduct that is more than merely negligent or careless." *McNulty*, 137 F.3d at 738. While a finding of bad faith will support a finding of willfulness, "bad faith is not a necessary predicate to a finding of willfulness." *Yan v. Bocar*, No. 04 Civ. 4194, 2005 WL 3005338, at *13 (S.D.N.Y. Sept. 30,

2005). Such a finding is particularly unnecessary where a defendant acted deliberately in defaulting. *See Gucci America, Inc. v. Gold Center Jewelry*, 158 F.3d 631, 634-35 (2d Cir. 1998). Indeed, defaults resulting from deliberate conduct are generally not excusable. *See American Alliance Ins. Co., Ltd. v. Eagle Ins. Co.*, 92 F.3d 57, 60-61 (2d Cir. 1996)("[W]e have refused to vacate a judgment where the moving party had apparently made a strategic decision to default.").

Moreover, willful conduct of a defaulting party's attorney can be attributed to the client. "Normally, the conduct of an attorney is imputed to his client, for allowing a party to evade 'the consequences of the acts or omissions of []his freely selected agent' 'would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent.'" *McNulty*, 137 F.3d at 739 (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 633-34 (1962)).

Although Bravo and QAI, through their attorney, Isseks, conceded in open court that they had defaulted and indicated that they made a strategic choice to do so in order to avoid the high costs of litigation their conduct should not be considered a willful default because it was a part of the negotiation of the settlement agreement that was never fully executed. QAI and Bravo were willing to concede to a default until the Plaintiffs added a new term to the agreement, namely, that QAI and Bravo

admit the allegations of the complaint.  Apparently Plaintiffs'
insistence on the inclusion of that term altered the balance in
Defendants' "cost benefit analysis" of conceding the default.
While they failed to timely answer the amended complaint and did
not respond to certain discovery demands, such inaction may have
been due to their expectation that the matter was going to be
resolved.  I further note that after the withdrawal of
defendants' counsel Bravo submitted *pro se* applications to
dismiss the claims.

Judge Kaplan's findings in *Yan* are instructive.  One of the
defaulting defendants in *Yan* had also made an attempt to appear
*pro se* and to explain his situation to the court, which, coupled
with his other circumstances, *i.e.*, his lack of understanding as
to his need for a lawyer, provided a sufficient showing of
excusable neglect.  2005 WL 3005338, at *14.

Here, in view of the Second Circuit's strong preference for
deciding cases on the merits, the lack of an agreement as to the
admission of the facts in the complaint as part of the
settlement, coupled with the defendant's *pro se* attempt to move
to dismiss prior to entry of a default, mitigates against a
finding that the defendants' conduct was willful.

Prejudice

Delay is not a sufficient basis for finding prejudice to a
non-defaulting party.  *See id.* at *15.  "In order to establish

prejudice, plaintiff must demonstrate that the delay will result in the loss of evidence, create increased difficulties for discovery, or provide greater opportunity for fraud and collusion." *Id*. (internal quotation marks and citations omitted).[3]  However, "[t]he absence of prejudice to the non-defaulting party would not in itself entitle the defaulting party to relief from the judgment."  *McNulty*, 137 F.3d at 738.

Here, the Plaintiffs assert that, in the absence of a default judgment, QAI and Bravo will be afforded more time to make their assets unavailable and they will be unable to collect on any judgment that may be entered in their favor.  Other than the affidavit of Hartwig Kraft-von Wedel, an apparent business associate of Bravo, in which he outlines various international business dealings of Bravo, the Plaintiffs have offered no evidence to show that Bravo has or intends to transfer her assets around the globe so as to make them unavailable to the Plaintiffs.  Accordingly, this factor does not weigh in favor of granting the Plaintiffs' motion.


Meritorious Defense

---

[3] The court is cognizant of the Plaintiffs' complaint as to delays in providing discovery. The necessary discovery as to defendants Mariana De La Garza, QAI Chile, Centro, and Quintessence and Co. will be completed promptly and without further delays or extensions, as will the discovery concerning Defendants QAI and Maria Bravo should they prevail on this application.

The parties agree that the appropriate legal standard for the sufficiency of an asserted meritorious defense is as follows: "In order to make a sufficient showing of a meritorious defense . . . the defendant need not establish his defense conclusively . . . but he must present evidence of facts that, if proven at trial, would constitute a complete defense." *McNulty*, 137 F.3d at 740 (internal quotation marks and citations omitted).  While the defaulting party need only meet a "low threshold," he "must present more than conclusory denials when attempting to show the existence of a meritorious defense." *Yan*, 2005 WL 3005338, at *16.  *See Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167 (2d Cir. 2001)("In connection with a motion to vacate a default judgment, a defendant must present more than conclusory denials when attempting to show the existence of a meritorious defense.").

There are several exceptions to the application of the MSAWPA and FLSA.  For instance, the MSAWPA does not apply to year-round employees.  *See* 29 U.S.C. § 1801 ("It is the purpose of this chapter to remove the restraints on commerce caused by activities detrimental to migrant and seasonal agricultural workers; to require farm labor contractors to register under this chapter; and to assure necessary protections for migrant and seasonal agricultural workers, agricultural associations, and agricultural employers.") and § 1802(8),(10) (defining "migrant agricultural worker" and "seasonal agricultural worker" as, *inter*

*alia*, "an individual who is employed in agricultural employment of a seasonal or other temporary nature").  Like the FLSA, the statute also exempts small businesses that employ migrant and/or seasonal workers if the employment does not exceed the "500 man-day" test set forth in the FLSA.[4]  *See* 29 U.S.C. §§ 213(a)(6)(a), 1803(a)(2).  Further, even if the 500 man-day test is exceeded for migrant and seasonal workers, the defendant employer might still be exempt from the operation of the statute if it meets the criteria of the family business exemption.  This exemption is met by the employer so long as any recruiting, soliciting, furnishing, transporting or hiring of any migrant or seasonal agricultural worker is performed only by the owner or an immediate family member of the owner of the farm.  *See* 29 U.S.C. §§ 1802(6), 1803(a)(1).

QAI and Bravo asserted each of these defenses, arguing that: (1) they are not liable to the Plaintiffs because, as employers, they are exempt from the overtime and minimum wage requirements of the FLSA and the MSAWPA; (2) the Plaintiffs are not workers covered by the MSAWPA; and (3) they have paid the Plaintiffs in

---

[4] The "500 man-day" test of the FLSA states that the minimum wage and maximum hour requirements shall not apply to "any employee employed in agriculture (A) if such employee is employed by an employer who did not, during any calendar quarter during the preceding calendar year, use more than five hundred man-days of agricultural labor."  29 U.S.C. § 213(a)(6).  The FLSA defines a "man-day" as "any day during which an employee performs any agricultural labor for not less than one hour."  29 U.S.C. § 203(u).

full for any work they did on the alpaca farm.  QAI and Bravo,
however, offered few facts or evidence to support these
conclusions.  In their submissions they offered no records to
show that they met 500 "man-day" test so as to exempt them from
certain requirements of the FLSA and MSAWPA or that they are, in
fact, a family business, which would exempt them from the MSAWPA.
Nor did QAI and Bravo in their written submissions offer records
or any other evidence to show that the Plaintiffs were, in fact,
paid for their work.  While these unsupported assertions might be
insufficient in and of themselves to overcome the entry of a
default judgment, they do raise issues which, if supported by
evidence, would constitute defenses to the complaint.
Accordingly, in the interests of justice and in light of the
policy disfavoring default judgments, I ordered an evidentiary
hearing, which was conducted on Thursday, January 12, 2006 and
Tuesday, January 17, 2006.  At the hearing, I heard testimony
from Bravo and her daughter, Alexandra De La Garza, listed in the
pleadings as Mariana De La Garza.

The evidence submitted by the defendants at the hearing is
intended to demonstrate that they met the 500 man-day test of the
FLSA so as to exempt them from the MSAWPA and the minimum wage
and maximum hour provisions of the FLSA.  In support of their
position that the exemption applies to them, Bravo and QAI
introduced the time sheets of their employees for the period in

issue, along with what purports to be a Federal Evidence Rule 1006 summary of those documents prepared by Mariana De La Garza, Bravo's daughter and bookkeeper. That summary (Hearing Exhibit 3) is alleged to accurately reflect the hours worked, hourly wage, and amounts earned as wages by each employee during the period in issue. Although the Plaintiffs correctly assert that the defendants have not come forward with payroll checks, receipts, or bank statements proving that the wages owed were paid, the summary does set forth check numbers by which many of the payments are alleged to have been made. Moreover, while the summary was not offered for that purpose and Plaintiffs' counsel agreed that he did not need to explore the exhibit on that issue, *see* Tr. at 80,[5] there is specific (as opposed to conclusory) sworn testimony from both Bravo and De La Garza that the workers were paid. *See* Tr. at 50, 65, 92. A sufficient evidentiary basis was set forth for the admission of the summary, which along with the sworn testimony, if proven at trial, would constitute defenses, namely, that the 500 man-day test was met and that the workers were paid.

Defendants QAI and Bravo also introduced tax return evidence to demonstrate that their gross income did not exceed $500,000 in any calendar year between 2000 and 2003 (Hearing Exhibit 1) and

---

[5] "Tr." refers to pages in the transcript of the hearing conducted on January 12 and 17, 2006.

that, therefore, they were not an enterprise engaged in commerce within the meaning of the FLSA during the relevant time period. The Plaintiffs, on the other hand, argue that, even if the defendants cannot be deemed an enterprise engaged in commerce, the Plaintiffs handled livestock that moved in interstate commerce and, therefore, were engaged in the production of goods for commerce.  They assert that such activity places them within the purview of the statute.

The FLSA provides that "[e]very employer shall pay [the minimum wage] to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 206(a).  The FLSA defines "commerce" as "trade, commerce, transportation, transmission, or communication among the several States or between and any place outside thereof."  29 U.S.C. § 203(b). "Enterprise engaged in commerce or in the production of goods for commerce" is defined as, *inter alia*,

> an enterprise that –
>
>> (A)(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and
>>
>> (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000.

29 U.S.C. § 203(s)(1).

While Plaintiffs may be correct in their assertion that defendants are engaged in commerce, within the meaning 29 U.S.C. § 206(a), the question of payment, which is, of course, a defense, remains open and unresolved. The testimony of De La Garza and Bravo at the hearing, taken with the summary ( Hearing Ex. 3), is sufficient to raise a factual issue concerning the defense of payment.

Further on the issue of whether the employees of the defendants were paid for their work, the Plaintiffs assert that the absence of names from what are alleged to be the time sheets of each worker, *see* Tr. at 84, precludes a defense of payment. The federal regulations require employers to keep records for employees that are subject to the minimum wage or minimum wage and overtime provisions of the FLSA:

> (a) Items required. Every employer shall maintain
> and preserve payroll or other records containing the
> following information and data with respect to each
> employee to whom section 6 or both sections 6 and
> 7(a) of the Act apply:
>
> > (1) Name in full, as used for Social Security
> > record keeping purposes, and on the same
> > record, the employee's identifying symbol or
> > number if such is used in place of name on any
> > time, work, or payroll records . . .

29 C.F.R. § 516.2(a). However, De La Garza testified that the time sheets were filled out by each individual worker and placed in their individual folders and that the folders were kept in a

24

particular order, which enables her to identify a particular folder and the sheets contained in that folder as belonging to a particular worker. *See* Tr. at 89, 91, 92. Thus, there is a dispute as to whether De La Garza's evidence, if proven at trial, is sufficient to establish that the defendants have satisfied the record keeping requirements of the FLSA.

The defendants' proffer of their income tax returns for the years 2000 through 2003 indicates that their gross sales were never more than $500,000 in any year; they argue that, therefore, they do not meet the statutory definition of an enterprise and are not subject to the provisions of the FLSA. There are, however, open issues concerning whether Bravo and QAI should be considered a joint employer with the other defendants – QAI Chile, Centro, and Quintessence and Co.; whether the defendants' employees engaged in non-agricultural labor such as house painting, handling boxes containing merchandise for defendants' retail clothing operation, child care, and, if so, when and how often; whether plaintiff Luis Osorio Silva and other individuals alleged by defendants to be "students engaged in practice," *see* Tr. at 48-53, 78, 80, 90, were entitled to be paid;[6] and whether

---

[6] Two important elements in determining the "economic reality" of an employment situation are whether there was an expectation or contemplation of compensation and whether the employer received an immediate advantage from any work done by the individuals. *Archie v. Grand Cent. Partnership, Inc.,* 997 F.Supp. 504, 533 (S.D.N.Y. 1998).

QAI, as operated by Bravo and De La Garza qualifies as a family business under § 4(1) of the MSAWPA, 29 U.S.C. § 1803(a)(1), *see* Tr. at 7,8,18.

All of these matters will require discovery to clarify the facts underlying each issue as well as legal briefing to ascertain the impact of those facts on the operation of the statutes. The defendants QAI and Bravo have come forward with evidence in the form of their sworn testimony supported by documentary exhibits which, if proven at trial, are sufficient to constitute complete defenses to the claims of the plaintiffs. Accordingly, I respectfully recommend that the Plaintiffs' motion for default judgment be denied.

<u>Notice</u>

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Rule 72(b), Fed. R. Civ. P., the parties shall have ten (10) days, plus an additional three (3) days, pursuant to Rule 6(e), Fed. R. Civ. P., or a total of thirteen (13) working days, (*see* Rule 6(a), Fed. R. Civ. P.), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Colleen McMahon, U.S.D.J. at the United States Courthouse, and to the chambers of the undersigned, at this Courthouse, 300 Quarropas Street, White Plains, New York 10601

Street, White Plains, New York 10601

Failure to file timely objections to the Report and Recommendation will preclude later appellate review of any order to judgment that will be entered by Judge McMahon. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied* 113 S. Ct. 825 (1992); *Small v Secretary of H.H.S.*, 892 F.2d 15,16 (2d Cir. 1989) (*per curiam*); *Wesolek v. Canadair, Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988). Requests for extension of time to file objections must be made to Judge McMahon and should *not* be made to the undersigned.

Respectfully submitted,

Mark D. Fox
U.S. Magistrate Judge

Date: March 3, 2006
White Plains, New York

Copies of the foregoing have been sent via ECF to the following:

Honorable Colleen McMahon, U.S.D.J.

Daniel Werner, Esq.
Attorney for Plaintiffs
Workers' Rights Law Center of New York, Inc.
101 Hurley Avenue, Suite 5
Kingston, New York 12401

Steven Felsenfeld, Esq.
The Hilpert Law Offices
75 South Riverside Avenue
Croton-on-Hudson, New York 10520